JUSTICE HART, dissenting.
¶33 Ponzi schemes are tragedies, and, here, the Receiver's interest in being able to take some of Taylor's "false profits" to cover losses of others who invested in the Mueller Funds is understandable. One can certainly debate the equities of such an effort at redistribution of losses amongst innocent parties. But the Colorado Uniform Fraudulent Transfer Act ("CUFTA" or the "Act") cannot be used to effectuate this laudable goal. I respectfully dissent.
¶34 The majority makes two interrelated errors. First, like the district court, the majority appears to consider not the individual transfers made from the Mueller Funds to Taylor, but the investment scheme as a whole, and the total amount ultimately paid out to Taylor. CUFTA requires consideration of each individual transfer. Second, the majority assumes that because Taylor was an equity investor, he had no "claim" to payments made in excess of his principal.
*803 ¶35 By its plain language, CUFTA requires analysis of each individual transfer to evaluate 1) whether it was fraudulent as defined by section 38-8-105, C.R.S. (2018) and 2) whether the affirmative defense established by section 38-8-109(1), C.R.S. (2018) applies. In both of those sections of the law, and indeed throughout the Act, the words direct our attention to the question of whether "a transfer" can be challenged under CUFTA. This language requires assessment of individual transfers-not a package of transfers.
¶36 The only other state supreme courts to consider this question have reached the same conclusion. See Oklahoma Dept. of Sec. ex rel. Faught v. Blair, 231 P.3d 645 (Okla. 2010) ; Finn v. Alliance Bank, 860 N.W.2d 638 (Minn. 2015) ; Janvey v. Golf Channel, Inc., 487 S.W.3d 560 (Tex. 2016). As the Texas Supreme Court recognized in considering how the Texas Uniform Fraudulent Transfer Act should apply in the context of a Ponzi scheme, "[v]alue must be determined objectively at the time of the transfer and in relation to the individual exchange at hand rather than viewed in the context of the debtor's entire enterprise, viewed subjectively from the debtor's perspective, or based on a retrospective evaluation." See Janvey, 487 S.W.3d at 582. The Minnesota Supreme Court similarly recognized, in interpreting that state's version of CUFTA, that "the focus of the statute is on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme.' " Finn v. Alliance Bank, 860 N.W.2d at 647.
¶37 As the court of appeals noted below, the district court's findings indicate that there were multiple individual transfers made from the Mueller Funds to Taylor between September 1, 2006, and April 19, 2007. The district court made no findings as to any of the individual transfers, and the investment agreement Taylor entered into with Mueller is not part of the record.[6] As a result, there was no way for the court of appeals to determine (and no way for us to determine) whether any of the individual transfers were for "reasonably equivalent value."
¶38 Reasonably equivalent value is a factual determination that Taylor is entitled to have made as to each individual transfer. I agree with the majority that considering the time value of money standing alone is not the correct way to evaluate whether each of Taylor's withdrawals was for reasonably equivalent value. Instead, at a minimum, the trial court must consider the terms of Taylor's investment agreement to determine whether each individual transfer made to him was for reasonably equivalent value.[7] Some of the transfers may have been for reasonably equivalent value; others may not have. But each transfer should have been considered on its own, as CUFTA requires.
¶39 Additionally, the mere fact that Mueller's Ponzi scheme was disguised as an equity investment vehicle (rather than, say, a loan participation agreement involving investor contracts specifying a rate of interest payable in periodic installments) does not mean that Taylor had no "claim" to a return on his investment as the majority suggests. In reaching that conclusion, the majority ignores the undisputed fact that Taylor had rights under an investment agreement. While, as the majority points out, Taylor did not have a right to a specified interest rate, he did apparently have the right to withdraw either principal or interest at any time from the funds contained in his investment account. See fn. 1, supra. Taylor exercised those rights. It may be true that until the moment he exercised his right to withdraw *804 either his principal or any supposed profit on that principal, he did not have any claim to those funds. But each time he requested a withdrawal from the Mueller Funds, Taylor established a claim to the amount requested. And each time one of the Mueller Funds paid out on a claim for such funds, it satisfied an antecedent debt pursuant to the investment agreement Taylor entered into when he deposited $3 million with Mueller.
¶40 The fact that a Ponzi scheme does not generate true profit from an investor's deposited capital should be irrelevant to the determination of reasonably equivalent value. An assessment of whether a transfer was made for reasonably equivalent value under CUFTA should not be dependent upon the concealed intent of a transferor. Rather-like section -109's requirement of good faith-reasonably equivalent value is a separately calculable factor that should be analyzed exclusively from the vantage point of the innocent transferee. See Janvey, 487 S.W.3d at 582 ("Whether a debtor obtained reasonably equivalent value in a particular transaction is determined from a reasonable creditor's perspective at the time of the exchange ... without the wisdom hindsight often brings.")
¶41 Consequently, an investor who unwittingly received false profits should not be divested of such amounts unless the principal he or she deposited could not have plausibly generated such a return had it been managed in accordance with the parties' investment agreement. To hold otherwise deprives transferees of a section -109(1) defense based on the transferor's concealed conduct alone and ignores the provision's purpose, namely, to provide a complete defense to the innocent recipient of a fraudulent transfer. The consequence of the majority's approach is that no innocent investor in a Ponzi scheme would ever be entitled to assert a section -109(1) affirmative defense. Nothing in CUFTA suggests that result.
¶42 To return briefly to the equities, the majority notes that none of the Mueller Funds' investors had a right to return of their principal or a guarantee of profit. As noted here, that was true until the moment any one of the investors exercised a withdrawal right under his or her investment agreement. In the equity investment context, one set of innocent investors should not be divested of funds (principal or profit) already disbursed in order to benefit other persons who took on the very same risk but unfortunately did not exercise the same withdrawal rights before the Ponzi scheme collapsed. As harsh as it may appear to leave investors who did not cash out their investment accounts, as Taylor did, with less than they believe they are due, permitting a receiver to obtain judgments against those who withdrew and disposed of funds they believed they were rightfully entitled to is equally unfair. It is also unwise as it undermines the finality of investment transactions, which, in turn, will discourage market participation.
¶43 For these reasons, I respectfully dissent.

The fact that such an agreement exists does not appear to be in dispute. See Taylor's Op. Br. at pp. 22-23, Lewis v. Taylor, No. 13CA239 (Jun. 20, 2013). According to Taylor, he had a contractual right to make withdrawals upon demand at any time, "up to the value of his investment account." Id. at p. 23. Thus, Taylor's argument that the payments he received from the Mueller Funds were made pursuant to the parties' contract is, on its face, plausible.

The then-existing market conditions, the time value of money of Taylor's principal, and his lost opportunity costs might also be part of this evaluation as each is relevant to a determination of reasonable equivalence. In other words, were the payments to Taylor in excess of what he could reasonably expect to have received from an investment vehicle of the variety he thought he had selected.